all such material statements were true, however, and the applicant, through mistake or excusable neglect, has failed to comply with the provision requiring the filing simultaneously with his application of the consents of property owners, but has subsequently obtained and filed such consents, the court is authorized to exercise its equitable discretion, and decline to cancel the liquor-tax certificate.

· At the time the petitioner applied to the court the licensee had no right to hold the certificate, and the court subsequently saw fit to order a reference to determine whether the respondent had a right to hold the certificate at the time it was issued, or afterwards perfected such right. The expense of this reference has been borne by the petitioner, · and it was rendered necessary through the neglect of the licensee. Equity, therefore, requires that he should pay the costs. The petitioner is awarded the sum of $125 for her costs and disbursements herein, against the respondent Louis F. Mayle, and an order may be entered accordingly, and dismissing the petition.

Ordered accordingly.

<hr/>

(18 Misc. Rep. 502.)

. MANLEY v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Special Term, Niagara County. November, 1896.)

**1. RAILROAD CROSSING—CONTRIBUTORY NEGLIGENCE—FINDING OF JURY.**
    A finding that plaintiff was free from contributory negligence is sustained by evidence that he stopped at a point three feet from a track, and listened for trains; that he saw defendant's flagman returning to a shanty after flagging a freight train which had just passed on another track; that he waited until the smoke of that train had partially cleared, and looked in both directions for approaching trains, but, seeing none, he attempted to cross the track, and was struck and injured by a train; and that no signals were given from the train or by the flagman.

**2. SAME—PERSONAL INJURY—VERDICT NOT EXCESSIVE.**
    A verdict for $9,000 for loss of a foot is not excessive where the evidence showed that plaintiff, a stationary engineer, 32 years old, had for over 11 months been earning $53.50 per month; that a second amputation became necessary; that he sustained other injuries by the accident, which produced great pain at the time, but from which he had recovered; that he had to wear an artificial foot, and had suffered pain up to the time of the trial, and would probably continue to suffer, when moving about.

Action by Fred Manley against the New York Central & Hudson River Railroad Company for personal injuries. There was a judgment for plaintiff, and defendant moves for a new trial. Denied.

Patrick F. King, for plaintiff.
Charles A. Pooley, for defendant.

LAUGHLIN, J. Eighth street is a public highway, running north and south in the city of Niagara Falls. A switch track, used very little, and owned by defendant, crosses the street at grade, and nearly at right angles. Thirty or forty feet to the south, two main tracks of defendant's road also cross Eighth street, or a continuation thereof, known as "Quay Street," at grade. Fifty feet west of the street the switch track passes through an overhead iron truss bridge, 110

feet in length, which spans the hydraulic canal. Large quantities of rock excavated in widening this canal had been piled upon either side of and in Eighth street north of the switch track, leaving only a narrow passage for public travel, and extending on the westerly side of the street to within about two feet of the railroad ties, and rising perpendicularly to a height of about seven feet close to the line of travel in Eighth street. The plaintiff was a stationary engineer, and was familiar with the crossing. He was walking along Eighth street on his way to work, approaching the crossing from the north, between 5 and 6 o'clock in the evening on June 5, 1893. When he reached a point three feet from the north rail of the switch, where the stone piles no longer obstructed his view, he stopped to look and listen. He saw the flagman, who had for a long time been stationed at the crossing by the defendant, returning to his shanty, after flagging a freight train which had just passed to the east over one of the main tracks. Some steam drills and a stone-crushing machine working in the immediate vicinity made considerable noise. The plaintiff, while standing there, listened for a train, and looked towards the west. At first his view was obstructed by smoke from the freight train, and perhaps from the stationary engines. The track curved two feet to the north between the bridge and the street. The evidence warranted the jury in finding that the side trusses of the bridge would then prevent his seeing the track more than halfway to the bridge, or 105 feet. He contradicts himself on the question as to whether the smoke still obstructed his view to the west when he ceased to look in that direction; but he testifies positively that the train was not then between him and the middle of the bridge, and I think the jury was at liberty to find that he waited until the smoke cleared away, or, at least, that it was not so dense as to prevent his seeing an approaching train. He then turned his eyes to the east, where his view was also somewhat obscured by smoke, and started across the track. After stepping over the first rail, he heard a rumbling noise, and, looking to the west, saw the train within 6 or 12 feet, bearing down upon him. He jumped backward, but the tender of the engine, which was backing, hauling six or seven freight cars, struck his shoulder, and threw him to the ground several feet to the east, and his right foot was crushed by the wheels of the tender and engine. The plaintiff presented other evidence that no signals were given from the train or by the flagman, and that the train was running at the rate of from 15 to 25 miles an hour.

Under all of the evidence, in view of the location and surroundings, the jury was justified in finding that the plaintiff was free from contributory negligence. He had a right to rely to some extent upon the conduct of the flagman. After looking carefully when within 3 feet of the track, and when he could see 105 feet to the west, he was not bound to anticipate that the defendant would propel a train of cars over that switch track without signal or other warning, at such an excessive rate of speed as to run him down while he was taking the five or six steps necessary to cross

the track. Glushing v. Sharp, 96 N. Y. 676; McNamara v. Railroad Co., 136 N. Y. 650, 32 N. E. 765; Oldenburg v. Railroad Co., 124 N. Y. 414, 26 N. E. 1021; Wilber v. Railroad Co., 8 App. Div. 138, 40 N. Y. Supp. 471; Pitts v. Railroad Co., 79 Hun, 546, 29 N. Y. Supp. 871; Kane v. Railroad Co., 132 N. Y. 160, 30 N. E. 256.

After looking and listening when within three feet of the track, the plaintiff had no right to close his eyes and ears while walking over the crossing. The duty to look and listen was continuous, and the jury was so instructed. It is urged on this motion that the plaintiff should have been nonsuited for his failure to look again towards the west. Whether he should have looked to the west again, in view of the conduct of the flagman, and under all the circumstances, was a question for the jury to determine. It was his duty to look after he had passed the obstructions, so that he could see the track for a considerable distance. This he did, and more, for he stopped, that he might look and listen with greater certainty. He was not bound to see the train, unless, by a reasonably careful exercise of his faculties, he would have seen it. Greany v. Railroad Co., 101 N. Y. 419, 5 N. E. 425; Shaw v. Jewett, 86 N. Y. 616. It was not his duty, as a matter of law, to look at the point from which he could see the greatest distance, nor was it his duty to look at the precise moment of time when the train could have been seen. When, so far as a pedestrian knows, a train is as likely to come upon him from one direction as another, the courts cannot adjudge him guilty of negligence for failing to look in a particular direction at a particular moment of time. While stepping onto the track, he was looking to the east, and listening for a train. We cannot say, as a matter of law, that he should have been looking to the west, when he had, only a few seconds before, looked in that direction. Waldele v. Railroad Co., 4 App. Div. 549, 38 N. Y. Supp. 1009; Rodrian v. Railroad Co., 125 N. Y. 526, 26 N. E. 741; Seeley v. Railroad Co., 8 App. Div. 402, 40 N. Y. Supp. 866.

The learned trial judge, in his charge, reviewed the material facts, and fully instructed the jury upon the law in language so clear and plain as to be comprehended by all. The defendant's counsel requested the court to charge that, if the plaintiff's vision was obstructed by the temporary volume of smoke, it became his duty to wait until the smoke had cleared away before attempting to cross the track. The court declined to change the charge on that subject, and defendant's counsel excepted. The charge, as made, left it to the jury, as a question of fact, to say whether the smoke obstructed his view, and whether the plaintiff should have again looked in that direction. Since the decision of the court of appeals in McNamara v. Railroad Co., 136 N. Y. 650, 32 N. E. 765, the cases of Heaney v. Railroad Co., 112 N. Y. 122, 19 N. E. 422, and Foran v. Railroad Co., 64 Hun, 510, 19 N. Y. Supp. 417, are not authority for all that appears to have been there decided with reference to the duty of a pedestrian whose view of a railroad track is partially obstructed by smoke. In this case, however, the evidence did not show that there was sufficient smoke to entirely obscure the view.

The facts to which we have alluded were not all undisputed, but they required that the case be submitted to the jury.

It is further urged that the verdict is excessive. The plaintiff generally earned at his trade $2.25 or $2.50 a day, and at the time of the trial he had been working for about 11 months for $53.50 per month, including Sundays. His foot was amputated a little above the ankle, and a further operation became necessary two months thereafter. An artificial foot has been adjusted to his limb, so that he can move about with considerable freedom. He sustained other injuries, producing much pain at the time, but from which he has recovered. It was a painful injury and operation, and for a long period the plaintiff suffered intense pain, and continued to suffer more or less in the use of the artificial foot down to the time of the trial, and will probably suffer more or less as the limb becomes tired throughout his natural life. The plaintiff was 32 years of age. The jurors saw him, and had an opportunity of observing his artificial foot. They were in a better position to judge of his earning capacity, of the probabilities as to the length of his life, and of the extent to which the loss of this limb and the use of the artificial foot will incapacitate him, and of the pain and suffering that he has endured, and will continue to endure, from this and the other injuries which he received. An examination of the reported cases shows that verdicts have been reduced or new trials have been granted in many cases where the verdict was no larger in proportion to the injuries than that rendered in this case; and, on the other hand, many verdicts have been sustained where the amount awarded as damages was far greater in proportion to the injury than the verdict rendered in this case. It was the duty of the jury to fully compensate the plaintiff for the pain and suffering that he has endured, and will endure in the future, and his loss of services and incapacity to work. I am not convinced that the verdict ought to be reduced or set aside as excessive. The motion for a new trial is therefore denied.